UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:15CR245 HEA (SPM) |
| | ) | |
| JUSTIN PAYNE | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

In accordance with the Memorandum filed herein,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress

Statements [Doc. No. 16] be **GRANTED.**

**IT IS FURTHER RECOMMENDED** that Defendant's Motion to Sever

[Doc. No. 17] be **DENIED**.

**IT IS HEREBY ORDERED** that Defendant's Motion for a Bill of

Particulars [Doc. No. 18] is **GRANTED, in part and DENIED, in part**. With

respect to Count 2 of the Indictment, the United States must provide the specific

conduct by Defendant alleged to have caused transmission of a program,

information, code or command to a protected computer. Defendant's Motion for a

Bill of Particulars is denied in all other respects.

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Trial in this case has been set on **October 12, 2015,** at **9:30 A.M.** before the Honorable Henry E. Autrey.

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of August, 2015.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:15CR245 HEA (SPM) |
| | ) | |
| JUSTIN PAYNE | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM, ORDER AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE**

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 (b). Defendant Justin Payne was arrested on March 31, 2015, for an alleged cyberattack on the St. Louis County Police Association's computers following the death of Michael Brown and related unrest in Ferguson, Missouri. Payne was subsequently charged in an indictment with one felony count of possession of an unregistered firearm and one misdemeanor count of damage to a protected computer. Within the deadlines established in the Order Concerning Pretrial Motions, Payne filed a motion to suppress statements (Doc. 16); a motion to sever (Doc. 17) and a motion for a bill of particulars (Doc. 18). The government filed a Response opposing each of Defendant's pretrial motions (Doc. 20). On July 17, 2015, the Court held a hearing on Defendant's various motions. Following the hearing, the Court ordered an expedited transcript of the hearing to assist in ruling on the various motions. The transcript of the hearing was filed on July 24, 2015. As such, the matter is ready for a ruling.

## A. **Defendant's Motion to Suppress Statements (Doc. 16)**

As to Defendant's motion to suppress statements, based upon the evidence adduced at the hearing and the record as a whole, the undersigned makes the following findings of fact and conclusions of law.

### 1. **Findings of Fact**

On March 27, 2015, Defendant Justin Payne was charged in a one-count Misdemeanor Information with Fraud Activity Connected with Computers, and a warrant was issued for his arrest. On March 31, 2015, Payne was arrested at the VA Records Management Center in St. Louis, Missouri and placed in a vehicle occupied by Special Force Officer Brian Mize ("SFO Mize") and Special Agent Ashley Frazer ("Agent Frazer"). SFO Mize and Agent Frazer transported Payne to the FBI office for a video recorded interview.[1] SFO Mize attempted to engage Payne in conversation during the drive to the FBI office, but Payne indicated they were not friends so no further discussion took place.

Payne was never verbally advised of his *Miranda* rights and, initially, was not told why he was arrested. Shortly after sitting down in the interview room, Payne asked if he was under arrest, and SFO Mize informed Payne that he was. SFO Mize then placed a Federal Bureau of Investigation ("FBI") Advice of Rights form (the "Form") in front of Payne and stated that he would explain everything to Payne but he first needed to "get through" Payne's rights. [2] SFO Mize then read the first line of the

---

[1] The government submitted a disc containing the entire recorded interview as evidence and played a portion of the interview at the evidentiary hearing.

[2] The Form consists of two sections: the top section, entitled "Your Rights," lists the rights required under *Miranda*:

> Before we ask you any questions, you must understand your rights.
> You have the right to remain silent.
> Anything you say can be used against you in court.
> You have the right to talk to a lawyer for advice before we ask you any questions.
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

Form, which states, "Before we ask you any questions, you must understand your rights." SFO Mize asked Payne if he understood; Payne indicated that he did by shaking his head affirmatively. SFO Mize asked Payne to "initial right there" next to the line SFO Mize had just read. When Payne hesitated, SFO Mize stated, "Once again, it's not an obligation to talk to us." Payne replied, "I mean I'm gonna talk to you but I would like to know what I'm being arrested for." SFO Mize indicated he would go over why Payne was arrested as soon as he finished going through the Form.

At that point, Payne began reading quickly through the Form. The video recording makes clear that Payne, who was holding a pen in his hand and using it to follow each line of the Form, read through the rights portion of the Form with increasing speed as he went from the top of the Form to the bottom. Although Payne asked SFO Mize to "hold on" while Payne read the Form, SFO Mize continued talking while Payne was trying to read the Form. For example, while Payne was quickly scanning the Form SFO Mize stated "This is just our procedure that we follow . . . these are basic rights." When SFO Mize asked Payne whether there was anything on the Form he did not understand and that he wanted SFO Mize to explain, Payne, still looking at the Form, stated "No, I don't." At that point, the video clearly shows Payne reviewing the Consent section of the Form at a more measured pace. After reading the Consent section of the Form, Payne put down the pen he had been holding, without signing anything.

While Payne was still looking down at the Form, SFO Mize stated "then if you want to sign it, I'll go through what is gonna happen, what you are charged with, that type of thing . . . ." When Payne hesitated again, SFO Mize tried to reassure Payne, stating (while motioning toward the "Your Rights" section), "it's not an obligation to talk to us, it just says that you understand that you have these rights since you are in our custody." Payne then initialed the "Your Rights" section of the Form.

---

The second section, entitled "Consent," states, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." *See* Govt. Exh. 1.

After Payne initialed the "Your Rights" section of the Form, SFO Mize then pointed to the "Consent" section of the Form and stated, "Ok and would you mind signing that right there?" to which Payne replied, "I mean I don't want to sign that's a consent. I'm not giving any kind of consent to anything." SFO Mize responded by saying, "Ok, then we're done" and gathered his file folder as if he were about to leave the interview room.

After a brief pause, SFO Mize continued:

SFO MIZE:     I mean, I'm not . . . I'm not asking you to talk to me –

PAYNE (interrupting SFO MIZE):    I'd just like to know what I'm charged with –

SFO MIZE (interrupting PAYNE):    --Okay, well let's get your rights done because that's my procedure

PAYNE:        (motioning to the different sections of the Form): My rights here, consent here, that's two different things brother

SFO MIZE:     Ok, so you understand your rights then?

PAYNE:        Yes

SFO Mize made no further attempt to review the rights listed on the Form or to otherwise verbally advise Payne of his rights. Nor did SFO Mize otherwise persist in asking Payne to sign the Form or to otherwise consent to the interview without counsel. Instead, he briskly took the Form away from Payne, signed it, and handed it to Agent Frazer, who also signed it. SFO Mize then proceeded to inform Payne about the investigation and his suspicions about Payne's involvement in the activities that lead to the issuance of the arrest warrant. SFO Mize eventually advised Payne that he had been charged with a federal misdemeanor offense which SFO Mize described as "not the crime of the century." Payne never requested an attorney or otherwise refused to talk to SFO Mize. Rather, he responded to SFO Mize's statements about the investigation and ultimately made a number of statements (incriminating and exculpatory) regarding his involvement in the offense.

When he was attempting to persuade Payne to sign the consent section of the Form, either by design or mistakenly, SFO Mize repeatedly misrepresented the significance of Payne's signature on the Form. The "Your Rights" section of the Form lists the rights required under *Miranda* but contains no place for a signature. The lower section of the Form, entitled "Consent," contains the signature line. It states: "I have read this statement of my rights and I understand what my rights are. ***At this time, I am willing to answer questions without a lawyer present***." *See* Govt. Ex. 1 (emphasis added). Notwithstanding the clear import of a suspect's signature in the "Consent" section, when SFO Mize first presented Payne with the Form, SFO Mize informed Payne that the Form "just says I can talk to you and explain to you what's going on." Later, when Payne appeared to be quickly scanning the Form on his own, SFO Mize represented that "[t]his is just our procedure that we follow, so . . . these are basic rights" and the Form "just says that you understand that you have these rights since you are in our custody." SFO Mize then attempted to persuade Payne to place his signature in the "Consent" section of the Form.

The evidence of record makes clear that Payne read the Form and comprehended enough of the Form to recognize that one section of the Form pertained to "Rights" while the other section pertained to "Consent." Payne also indicated that he understood his rights and placed his initials in the section of the Form entitled "Your Rights." However, it is not clear from the record that Payne, in fact, read each of the rights listed on the Form; in particular, the speed with which Payne appeared to skim through the rights related to the right to counsel located at the bottom of the "Your Rights" section of the Form suggests he may not have read those rights in their entirety, if at all.

Although SFO Mize commented that he believed Payne was "a smart guy," the government presented no evidence at the hearing about Payne's education level. In addition, neither agent asked Payne if he had, in fact, read all of the rights listed on the Form. Finally, although Agent Frazer testified

that Payne had been arrested in the past, the government presented no evidence about the timing of the past arrest; no evidence that Payne was advised of his *Miranda* rights in connection with any past arrest; and no evidence that Payne was otherwise already familiar with his *Miranda* rights.

### 2. Conclusions of Law

Payne contends his post-arrest statements should be suppressed because they were made after Payne clearly invoked his Fifth Amendment rights and because they were made without a knowing and valid waiver of his Fifth Amendment rights.

The Fifth Amendment protects an individual from being "compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. In *Miranda v. Arizona*, the Supreme Court recognized that custodial interrogations have the potential to undermine the Fifth Amendment privilege against self-incrimination and established a prophylactic procedural mechanism that requires a suspect to receive a warning before any custodial interrogation begins. 384 U.S. 436, 444-55 (1966). As such, *Miranda* instructs that before questioning suspects in custody, law enforcement officials must inform suspects, in some manner, that: (1) they have the right to remain silent; (2) their statements may be used against them at trial; (3) they have the right to the presence of an attorney during questioning; and (4) if they cannot afford an attorney, one will be appointed for them. *Id.* at 478-79.

Because "the circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege to remain silent by his interrogators," the Supreme Court has held that "as an absolute prerequisite to interrogation, [. . .] an individual held for questioning must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation." *Florida v. Powell,* 559 U.S. 50, 60 (2010) (internal quotation marks omitted).

### a. Invocation of Rights

Payne contends he clearly invoked his *Miranda* rights when he refused to sign the Form and stated that he wasn't consenting to anything. If a defendant clearly and unambiguously invokes his right to remain silent or his right to counsel either prior to, or during interrogation, then further questioning is permissible only if law enforcement officials "scrupulously honor" the defendant's assertion of those rights. *Michigan v. Mosley,* 423 U.S. 96, 102-04 (1975) (holding that *Miranda* cannot sensibly be read to create a *per se* prohibition against further interrogations once the accused indicates a desire to remain silent, but police must scrupulously honor a suspect's invocation of the right to silence); *see also Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (holding that an accused who has expressed his desire to deal with police only through counsel "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police").

In *Miranda,* the Supreme Court held the interrogation must cease "if the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent." *Miranda,* 384 U.S. at 473-74. Some courts following *Miranda* construed this language as setting a relatively low bar for establishing a defendant's invocation of his Fifth Amendment rights. However, in *United States v. Davis,* 512 U.S. 452, 459 (1994), the Supreme Court held that in order to invoke the right to counsel and, thereby cut off further questioning, "at a minimum," the defendant must make "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." In *Davis*, the Court held that police were not required to cease questioning when the defendant, who was in custody and being interviewed by police, said, "Maybe I should talk to a lawyer." *Id.* at 459-62. The Court concluded that in order to trigger the right to cut off questioning, the accused must "articulate his

desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459.

In *Berghuis v. Thompkins,* 560 U.S. 370, 380-82 (2010), the Supreme Court held that the standard for invoking the right to counsel established in *Davis* also applies when determining whether a suspect has invoked his Fifth Amendment right to remain silent. The defendant in *Berghuis,* Van Chester Thompkins, was arrested in connection with a fatal shooting and taken into custody. He was presented with a form derived from the *Miranda* rule and asked to read the last warning on the form out loud. *Id.* at 374-75. Thompkins obliged, demonstrating to the officer that he could read. *Id.* at 375. The officer then read the other warnings on the form out loud and asked Thompkins to sign the form to demonstrate that he understood his rights, but Thompkins declined to do so. *Id.*

The officers then began an interrogation that lasted for nearly three hours. *Id.* Thompkins remained largely silent in response to questions from officers over that period of nearly three hours; ultimately, however, Thompkins made incriminating statements near the end of the interview. *Id.* The Court found that Thompkins' mere silence in the face of several hours of attempted questioning was not an unambiguous invocation of his right to remain silent. *Id.* at 382. Specifically, the Court noted that Thompkins **did** respond to some questions from police and "Thompkins **did not** say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his right to cut off questioning." *Id.* (emphasis added) (internal quotation marks omitted).

In *Berghuis*, the Court acknowledged that it had not previously stated whether an invocation of the right to remain silent can be ambiguous or equivocal. *Id.* at 381. The Court concluded that "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*." *Id.*

Neither *Berghuis* nor *Davis* squarely addresses the specific issue presented here: does a suspect who is in custody trigger the right to cut off questioning by stating, in response to a direct request to answer questions without a lawyer present, "I'm not giving any kind of consent to anything," and by refusing to sign a form consenting to an interview without counsel? The government contends that, under such circumstances, the refusal to consent is not an unambiguous invocation of rights that triggers the right to cut off questioning; it cites *United States v. Johnson,* 56 F.3d 947 (8th Cir. 1995), in support.

The defendant in *Johnson* was taken into custody and repeatedly informed of his rights, both orally and in writing. Johnson acknowledged that he understood his rights. *Id.* at 955. When the agent read the waiver portion of the form to determine if Johnson wished to waive his rights, "Johnson gave no direct answer but stated indirectly through use of profanity that he did not think he could help himself by talking." *Id.* Still unclear about whether Johnson was waiving his rights, the agent again attempted to determine if Johnson wished to waive his rights, and Johnson asked, "if I tell you anything, you're just going to use it against me later, aren't you?" to which the agent responded affirmatively. *Id.* At that point, Johnson refused to sign any forms but agreed to talk and stated, "you guys have all the evidence against me. I don't need to make any statement. I don't need to say anything." *Id.* Faced with mixed signals, the agent did not question Johnson about the crime but explained, "you have this opportunity to talk to me without a lawyer, to make a statement. You're the only person who can tell me about [the relevant] activities." *Id.* Johnson then responded in more certain terms, stating, "I know I'm going to jail for a long time, the rest of my life, I can't help myself by talking to you." Johnson said nothing further, and questioning ceased. *Id.*

The Eighth Circuit held that Johnson's "initial indirect and ambiguous statements [fell] far short of a clear or unequivocal expression of the right to remain silent." *Id.* The Eighth Circuit further held that suppression was not required because Johnson's statements were not made in response to any

questioning about the crime but in response to the agent's prudent attempts to determine whether Johnson wished to waive his rights. *Id.* (citing *Davis* for the proposition that it is often good police practice to attempt to clarify whether or not the suspect is actually invoking his rights).

*Johnson* is inapposite. Unlike Johnson, who gave no direct answer when asked if he wished to waive his rights, in this case, Payne stated, "I am not consenting to anything" when SFO Mize, in effect, asked Payne to consent to answer questions without an attorney present. In addition, the statements that are the subject of Payne's suppression motion in this case were not made in response to the agent's attempts to determine whether Payne wished to waive his rights. Instead, they were made during an interview conducted by SFO Mize after Payne indicated he did not agree to answer questions without a lawyer present.

Neither party has directed the undersigned to any Eighth Circuit cases addressing the specific issue raised here, nor has the undersigned found any. However, in *United States v. Plugh*, 648 F.3d 118, 120 (2d Cir. 2011) (hereinafter *Plugh II*), the Second Circuit Court of Appeals examined the question of whether a suspect's refusal to sign a waiver of rights form constituted a clear invocation of his *Miranda* rights. Although the facts of *Plugh II* are distinguishable from the facts of this case, the reasoning is instructive.

Plugh was arrested following an FBI investigation that uncovered evidence of child pornography on Plugh's computer. *Id.* at 120. Upon placing Plugh in handcuffs, the agents advised him of his *Miranda* rights and then asked him to sign a waiver-of-rights form. *Id.* Plugh, who could read and write, told the agents he understood his rights and added that he had previously worked in law enforcement as a state corrections officer. *Id.* at 121. However, Plugh declined to sign the waiver form, stating, "I am not sure if I should be talking to you," and "I don't know if I need a lawyer." *Id.* The agent wrote "refused to sign" on the waiver form and placed Plugh in a car for transport to the FBI field office. *Id.*

During the ride to the FBI field office, Plugh repeatedly asked the agents for advice on what to do. *Id.* The agents made it clear that they would not discuss the case further with Plugh but indicated that if he wished to cooperate and answer questions they would relay his cooperation to the U.S. Attorney's office. *Id.* Once at the FBI office, the agents informed Plugh he would be turned over to the U.S. Marshals for booking unless he first wanted to make any statement. *Id.* At that point, Plugh affirmatively indicated that he wished to make a statement. *Id.* The agents re-advised Plugh of his *Miranda* rights, and Plugh signed a waiver-of-rights form before making inculpatory statements to the agents. *Id.*

The district court suppressed Plugh's custodial statements after concluding that Plugh had successfully invoked his *Miranda* rights by refusing to sign the waiver-of-rights form. *Id.* Relying on existing circuit law, a panel of the Second Circuit affirmed the district court's decision. *United States v. Plugh,* 576 F.3d 135, 137 (2d Cir. 2009) (hereinafter *Plugh I*). However, after the Supreme Court's decision in *Berghuis*, the Second Circuit reconsidered *Plugh I* and reversed the district court's decision, holding that under *Berghuis,* Plugh did not unambiguously invoke his *Miranda* rights. *Plugh II,* 648 F.3d at 125.

The court in *Plugh II* rejected the notion that a refusal to sign a waiver-of-rights form will, by itself, "always" constitute a clear invocation of rights. *Id.* at 126. The court nevertheless acknowledged that there could be circumstances in which a suspect's refusal to sign a waiver-of-rights form might constitute a clear invocation of *Miranda* rights. *Id.* The court concluded Plugh's case did not present such a circumstance. *Id.* Specifically, the court held that Plugh did not meet the unambiguous invocation standard articulated in *Berghuis* because in addition to failing to affirmatively state he wanted counsel or wanted to remain silent, Plugh's refusal to sign the waiver-of-rights form was "accompanied by statements indicating ambivalence or uncertainty." *Id.*

Unlike *Plugh*, in this case, Payne's refusal to sign the waiver-of-rights form was not accompanied by statements indicating ambivalence or uncertainty. Although Payne indicated that he was willing to talk to the agents **before** he reviewed the rights section of the Form, after reading over the rights section of the Form, Payne refused to sign the consent section of the Form using language that cannot fairly be characterized as equivocal: "that's a consent. I'm not giving any kind of consent to anything."

The undersigned recognizes that because Payne never explicitly uttered the word "lawyer" or expressly stated that he did not want to talk to the agents, the question of whether Payne's right to cut off questioning was triggered is a close call. However, *Davis* does not require that a defendant specifically say the word "lawyer" in order to trigger the *Edwards* rule and cut off questioning. Rather, under *Davis*, "at a minimum," the defendant must make "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis,* 512 U.S. at 459. When SFO Mize asked Payne to sign the Form, he was effectively asking Payne to agree to "***answer questions without a lawyer present.***" Payne's response to that request was an unequivocal refusal to sign and an unequivocal statement, "I am not giving consent to anything." Given the circumstances, Payne's statement can reasonably be construed to be an expression of a desire for the assistance of an attorney.

Similarly, in *Berghuis*, the Supreme Court did not prescribe any specific incantation a suspect must recite in order to meet the "unambiguous invocation" standard. Indeed, *Berghuis* does not require any words at all; it requires only that the invocation of the right to remain silent be unambiguous. *See Commonwealth v. Clark,* 960 N.E.2d 306, 315 (Mass. 2012) (holding defendant met the heightened *Berghuis* standard and invoked his right to remain silent when he shook his head (negatively) in response to a direct question "So you don't want to speak?").

Here, the nature of what Payne was being asked to consent to (an interview without an attorney), coupled with Payne's refusal to sign the consent section of the Form and his contemporaneous statements that his rights and consent were two different things and that he was not consenting to anything, were sufficient to put the agents on notice that Payne was invoking his *Miranda* rights. Indeed, SFO Mize's statement, "then we're done here," in response to Payne's refusal to consent supports a finding that Payne's assertion of his *Miranda* rights would have been objectively apparent to any officer in SFO Mize's position. *See, e.g., Plugh II,* 648 F.3d at 121 (noting that after Plugh initially refused to sign the waiver-of-rights form the agents "would not discuss the case further with him" until Plugh subsequently affirmatively indicated that he wished to make a statement, was re-*Mirandized*, and signed a waiver-of-rights form).[3]

In sum, when all of the evidence is considered, the undersigned concludes that Payne unambiguously invoked his right to cut off questioning. As such, the agents were not permitted to continue the interview unless and until Payne reinitiated the interview or the officers "scrupulously honored" Payne's rights. *See Mosley,* 423 U.S. at 102-04 (requiring police to "scrupulously honor" suspect's invocation of right to silence once accused indicates desire to remain silent); *see also Edwards,* 451 U.S. at 484-85 (holding interrogation must cease if the suspect expressed his desire to deal with police only through counsel).

---

[3] Although the Second Circuit ultimately held that, under the circumstances presented in *Plugh II,* Plugh's refusal to sign the waiver-of-rights form was not an unambiguous invocation of his *Miranda* rights, the actions of the FBI agents in *Plugh II* provide some insight into how an officer in SFO Mize's position might objectively interpret Payne's statements and conduct in refusing to sign the consent section of the Form. In *Plugh II,* Plugh refused to sign a waiver of rights FBI form that appears to be virtually identical to the Form at issue in this case. Following Plugh's refusal, the agents in *Plugh* refused to talk further with Plugh about the case and interviewed him only after Plugh affirmatively indicated that he wanted to give a statement, and only after the agents re-advised Plugh of his *Miranda* rights and obtained a signed waiver of rights from Plugh. *See Plugh II*, 648 F.3d at 121.

The evidence does not support a finding that Payne's rights were "scrupulously honored" after he invoked them. The evidence also does not support a finding that Payne reinitiated the interview. Rather, after a brief pause, SFO Mize resumed talking to Payne, stating "I mean . . . I am not asking you to talk to me." When Payne indicated merely that he wanted to know why he was arrested, SFO Mize used that as an opening to resume the interview. He did so without seeking any explicit consent or waiver of rights from Payne. Because the agents failed to scrupulously honor Payne's Miranda rights after he invoked them, Payne's statements made during the custodial interview should be suppressed.

Even if Payne's statements and conduct do not constitute a clear and unequivocal invocation of his *Miranda* rights, his motion to suppress should be granted because, for the reasons stated below, the government has failed to establish a valid waiver of those rights.

### b. Waiver of Rights

Statements made in custodial interrogation may not be admitted as part of the prosecution's case in chief "unless and until" the prosecution demonstrates that an individual knowingly and intelligently waived his rights. *Miranda*, 384 U.S. at 479. Even if "the [government] establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate a valid waiver of *Miranda* rights. The prosecution must make the additional showing that the accused understood those rights" and deliberately relinquished them. *Berghuis,* 560 U.S. at 384-85. It is the government's burden to demonstrate satisfaction of this standard by a preponderance of the evidence. *Colorado v. Connelly,* 479 U.S. 157, 168 (1986).

The defendant's waiver of his rights must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine,* 475 U.S. 412, 421 (1986). A confession is not voluntary when obtained under circumstances that "overbear the defendant's will and critically impair his capacity for self-determination." *United States v. Boslau,* 632 F.3d 422, 428 (8th Cir. 2011) (quoting *United States v. LeBrun,* 363 F.3d 715, 724 (8th Cir. 2004)). The

defendant's waiver must also be "knowing" in that it is made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran,* 475 U.S. at 421. The court may conclude that a defendant's rights under *Miranda* have been properly waived only if a "totality of the circumstances surrounding the interrogation reveal both an un-coerced choice and the requisite level of comprehension." *Id.* (internal quotation marks omitted).

The evidence presented in this case falls short of establishing that Payne knowingly waived his *Miranda* rights. First, Payne was never verbally advised of his *Miranda* rights; instead, the agents chose to rely exclusively on Payne's reading of the written FBI Form. Although the video clearly shows that Payne read the Form and indicated that he understood his rights, the video evidence also suggests that Payne may not have read through all of the rights listed on the Form. Specifically, the video recording showed that as Payne neared the bottom portion of the Your Rights section of the Form he was rapidly scanning the words – essentially, speed reading. In addition, the evidence suggests Payne may have been distracted by SFO Mize. While he was quickly scanning the Form, Payne asked SFO Mize to "hold on" but, SFO Mize continued talking. The rights Payne appeared to speed-read through advised, "If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish" and "If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time." *See* Govt. Exh. 1.

The government presented no evidence of Payne's education level or ability to read (let alone, speed read). Neither agent ever read the rights out loud to Payne or asked Payne to read them out loud. Nor did either agent ever ask Payne if he had, in fact, been able to read each of the rights enumerated on Form. Based on the evidence of record, it is entirely plausible that, after quickly scanning the Form, Payne may have generally understood some of his *Miranda* rights but missed rights located near the

bottom of the rights section of the Form such as the right to have a lawyer appointed and the right to stop answering at any time if he decided to answer questions without a lawyer present.

The evidence also fails to establish that Payne made a "deliberate choice" to waive his *Miranda* rights. To the contrary, the evidence shows that Payne attempted to preserve his rights (as he understood them) when he unequivocally refused to sign the Form and stated that he was not consenting to anything. Other than the fact that the agents ultimately obtained statements from Payne, there is nothing in the evidence that suggests that Payne subsequently made a conscious choice to relinquish his rights.

Although there is no evidence that the agents used threats or force against Payne, the foregoing factual findings demonstrate that SFO Mize made misleading statements to Payne; used the disclosure of Payne's charge as a proverbial carrot to draw Payne into a dialogue about the offense; and continued the interview after appearing to accept Payne's refusal to consent. When SFO Mize continued the interview without seeking further consent or clarification from Payne, SFO Mize may have led Payne to believe that he had adequately preserved his rights and/or he was otherwise powerless to stop the interview.

This case is readily distinguishable from *North Carolina v. Butler*, 441 U.S. 369 (1979), which is relied on by the government. In *Butler,* prior to a custodial interview, FBI agents verbally advised Butler of his rights, presented him with an FBI advice-of-rights form after confirming that he was literate, and permitted him to read the form. *Butler,* 441 U.S. at 370. Butler confirmed he understood his rights, but when the agents asked him to sign the waiver at the bottom of the form Butler told the agents, "I will talk to you but I am not signing any form." *Butler,* 441 U.S. at 371. In holding that *Miranda* does not invariably require an express waiver of the right to silence or right to counsel, the Court upheld the state trial court's ruling that Butler had effectively waived his rights, including the right to have an attorney present during questioning, by stating that he was willing to answer questions after having been unquestionably advised of his rights. *Id.* at 371-74.

For the reasons stated above, this case is unlike *Butler* because there is a question as to whether Payne was fully apprised of his *Miranda* rights and because Payne never equivocated about withholding his consent to the interview. Given the totality of the circumstances, the mere fact that SFO Mize proceeded to successfully interview Payne despite his refusal to consent cannot, without more, constitute evidence of a valid knowing and deliberate waiver by Payne.[4]

In sum, Payne's motion to suppress should be granted because the government has failed to demonstrate by a preponderance of the evidence that Payne knowingly and deliberately waived his rights.

## B. <u>Defendant's Motion to Sever (Doc. 17)</u>

Defendant Payne contends that, pursuant to Fed. R. Crim P. 14(a), Counts 1 and 2 of the indictment should be tried separately because they were misjoined and because he would be prejudiced if the two counts are tried together.

Rule 8(a) of the Federal Rules of Criminal Procedure provides:

> (a) Joinder of Offenses. The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Because the joinder of offenses against defendants in a single trial is favored, the rules, including Rule 8(a), are to be liberally construed in favor of joinder. *United States v. Moyer*, 313 F.3d 1082, 1085 (8th Cir. 2002) (citing *United States v. Darden*, 70 F.3d 1507, 1526 (8th Cir. 1995)). Thus, joinder is ordinarily appropriate "'[w]here the offenses are similar in character and occurred over a relatively short

---

[4] The foregoing facts also distinguish this case from *Berghuis,* which held "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis*, 560 U.S. at 384. Although the defendant in *Berghuis* refused to sign a form acknowledging that he understood his rights, there was no evidence he was ever asked to agree to an interview without counsel, like Payne was in this case. The Court concluded the government established waiver by proving defendant was unquestionably advised of his rights, unquestionably understood his rights, and acted inconsistently with those rights. *Id.* at 385-86.

period of time and the evidence overlaps.'" *United States v. Tyndall*, 263 F.3d 848, 849 (8th Cir. 2001) (quoting *United States v. McClintic*, 570 F.2d 685, 689 (8th Cir. 1978)). "Similar character" means "nearly corresponding; resembling in many respects; somewhat alike; having a general likeness." *Id.* at 850 (interim quotations omitted). The period of time between offenses is not prescribed and the Eighth Circuit has upheld the joinder of offenses occurring over a twenty-month period, *see United States v. Rogers*, 732 F.2d 625, 629 (8th Cir. 1984), a seventeen-month period, *see United States v. Lindsey*, 782 F.2d 116, 117 (8th Cir. 1996) (per curiam), and a twelve-month period, *Tyndall*, 263 F.3d at 850.

Even if joinder is appropriate under Rule 8(a), the district court may nevertheless grant a severance if it appears that either the defendant or the government is prejudiced by joinder of offenses and such prejudice cannot otherwise be mitigated. *United States v. Midkiff*, 614 F.3d 431, 440 (8th Cir. 2010); *see also* Fed. R. Crim. P. 14(a) ("If joinder of offenses . . . in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts . . . ."). However, the Eighth Circuit has recognized that the possibility of prejudice to a defendant from the joinder of offenses is diminished by the giving of separate verdict directors for counts involving distinct offenses and by instructing the jury to consider each count and the relating evidence separately. *See United States v. Lawson*, 173 F.3d 666, 671 (8th Cir. 1999).

In this case, Payne is charged in a two-count indictment: Count 1 alleges Payne knowingly received and possessed a firearm, namely a Molotov cocktail, which was not registered to him in the National Firearms Registration and Transfer Record. Count 2 alleges Payne intentionally caused the transmission of a program, information, code, or command to a protected computer and intentionally caused damage without authorization to a protected computer.

At first blush the two counts appear to be completely different and unrelated, as one count involves a misdemeanor cyberattack while the other count involves the possession of a Molotov

cocktail. However, Payne's reaction to the events in Ferguson, Missouri following the shooting death of Michael Brown is the glue that binds these seemingly mismatched offenses together. As the government pointed out both in its response and during oral argument, both Counts of the indictment arise out of an investigation that began when Payne began posting tweets on Twitter responding to the death of Michael Brown and ongoing unrest in Ferguson. *See* Doc. 20, pp. 14-15. The information contained in the Twitter posts is relevant to both Counts of the indictment in this case. In addition, the Molotov cocktail that is the subject of Count 1 was found in Payne's car when he was arrested for the misdemeanor alleged in Count 2. As such, although the offenses Payne is charged with are not necessarily similar in character, joinder is appropriate because the underlying conduct occurred as part of the same ongoing transaction and there is sufficient overlap between the evidence required for both Counts.

While the undersigned acknowledges that there is a risk that Payne may be prejudiced if the two offenses are tried together, Payne has failed to demonstrate that the possibility of prejudice cannot be mitigated by the giving of separate verdict directors or limiting instructions to the jury.

For all of the foregoing reasons, Payne's motion to sever should be denied.

## C. **Defendant's Motion for Bill of Particulars (Doc. 18)**

Defendant Payne asserts he is entitled to a bill of particulars because both counts of the indictment are "completely lacking in any detail of Mr. Payne's actual conduct." *See* Doc. 18, p. 2. Defendant requests that the Court direct the government to file a bill of particulars providing: (1) the specific conduct by which Payne is alleged to have caused transmission of a program, information, code or command to a protected computer; (2) the location of all acts set forth in the indictment; (3) the time of the charged acts; (4) the alleged damage caused by Payne to the protected computer in the possession of St. Louis County Police Officer's Association; and (5) the makeup and components of the device referred to in Count 1.

It is well-settled that

> [A] bill of particulars serves to inform the defendant of the nature of the charge against him with sufficient precision to enable him to prepare for trial, to avoid or minimize the danger of surprise at trial, and to enable him to plead his acquittal or conviction in bar of another prosecution for the same offense when the indictment is too vague and indefinite.

*United States v. Hernandez*, 299 F.3d 984, 989-90 (8th Cir. 2002). However, "a bill of particulars is not a discovery device to be used to require the government to provide a detailed disclosure of the evidence that it will present at trial." *United States v. Livingstone*, 576 F.3d 881, 883 (8th Cir. 2009); *United States v. Huggans*, 650 F.3d 1210, 1220 (8th Cir. 2011).

With respect to Count 1, the indictment, together with discovery, is sufficient to permit Payne to prepare a defense to the charges and to plead a conviction or acquittal as a bar to a later prosecution. In Count 1, Payne is charged with Possession of an Unregistered Destructive Device. The indictment states the date of the crime, the place and the type of device (Molotov Cocktail). In addition, the government contends that the lab report detailing the FBI's findings regarding the conclusion that Payne possessed a Molotov Cocktail was included in the discovery; defendant has not refuted that contention.

With respect to Count 2, it is less clear that, even with the significant discovery provided to Payne, the indictment sufficiently alerts Payne to the "precise nature of the government's allegations" as they pertain to Payne's specific conduct. *See United States v. Mann,* 701 F.3d 274, 288 (8th Cir. 2012) (quoting *United States v. Dolan,* 20 F.3d 856, 866 (8th Cir. 1997)). In Count 2, Payne is charged with "Intentionally Damaging a Computer by Knowing Transmission," a violation of Title 18 U.S.C. section 1030(a)(5)(A). As the government correctly posits, the indictment sufficiently states the time, place, victim, and, the result of the offense. However, the allegation that Payne "knowingly caused the transmission of a program, information, code, or command" may well be legally sufficient for purposes of Fed. R. Crim. P. 7(c)(1), but it does not provide Payne with enough details about the alleged offending conduct to allow Payne to adequately prepare for trial. The undersigned recognizes that the

government has provided Payne with extensive discovery. However, none of that discovery has been presented to the Court and it is unclear from counsel's respective arguments that the specific conduct on which the offense is predicated can be easily gleaned from the discovery.

As such, while the undersigned finds no basis for granting Payne's motion for a bill of particulars with respect to request numbers (2)-(5) enumerated above, for the reasons set forth above, the undersigned does find that a bill of particulars with respect to request (1) is warranted.

For all of the foregoing reasons, the government must provide the specific conduct by Payne alleged to have caused transmission of a program, information, code or command to a protected computer. Payne's motion for a bill of particulars will be denied in all other respects.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 24th Day of August, 2015.